Department of State Special Enforcement Officers DE Permanent Yes, I can. Very well. With thanks for the party's patience. The first case that we call this afternoon is Delaware State Sportsman's Association at all. Numbers 23, 1633, 1634 and 1641 Mr. Olendorf for appellants gray at all. Good afternoon, your honors and may it please the court. Sean Olendorf for the gray and Graham appellants. With the court's permission, I'd like to reserve two minutes of time for rebuttal. Great. Your honors, under the Supreme Court's decisions in Heller and Bruin, this is a straightforward case. As a matter of the Second Amendment's plain text and this court's decision in the ANJRPC case, the firearms and magazines at issue plainly qualify as bearable arms. And under Bruin, that shifts the burden to Delaware to justify its bans as consistent with historical tradition. Now in Heller, the Supreme Court already looked at the history and determined that a flat ban on certain types of arms is consistent with historical tradition, only if those arms are not in common use for lawful purposes. But the district court here held that Delaware's laws do ban arms in common use. Indeed, the semi-automatic rifles banned by Delaware's law are the second most popular firearm type on the market today and the most popular rifle of all time. That should have been the end of the matter and the district court's decision upholding Delaware's bans anyway should be reversed. Counsel, you have the burden of proof in this proceeding, don't you? We have the burden of proof, Judge Bebas, on the initial Bruin taxed step. I would submit that the state has the burden on the second Bruin history inquiry, even although the fact, you know, we're here on a preliminary injunction. You have the burden of proof on the preliminary injunctive factors. Well, under this court's decision in Riley v. City of Harrisburg, the burden in a preliminary injunction case tracks the burdens as they would lie at summary judgment or trial. And under Bruin, those burdens are allocated such that we have the burden on the taxed step, they have the burden on the history step. Even if that's true as to the likelihood of excess on the merits, you have the burden on the other injunctive factors. That's correct, Judge Bebas, that is true. If you put in no evidence apart from some declarations here. On the irreparable harm factor, Judge Bebas? On irreparable harm, on balance of equities, public interest, all you put in were four declarations. Yes, Judge Bebas, and our declarations show that, you know, our plaintiffs wish to obtain these firearms. Plaintiffs who already have firearms, three of whom already have some of the assault weapons, so-called, and large capacity magazines, so-called. I don't know that all of our plaintiffs have the rifles or pistols that are banned by Delaware, but they certainly want to acquire them. But all of them avert that they currently do have firearms. They do have firearms. I wouldn't dispute that, Judge Bebas. So how are we supposed to infer from these declarations that they're suffering an irreparable injury? Because the only way we could do that is if we adopt a blanket rule that any deprivation of a Second Amendment right for any period of time automatically counts as irreparable injury. I think, I mean, I don't know if I would cast it in those absolute terms, Judge Bebas, but I would say that a law preventing someone from obtaining arms protected by the Second Amendment to keep them to bear, I mean, this is a going forward ban, so I don't know if we can call it temporary, but yes, that law, we would submit to you, is a per se violation of the Second Amendment and per se irreparable injury. So the moment you satisfy the likelihood of success prong, then there really is no irreparable harm prong, right? That's what you're essentially telling us. I'm essentially saying, Judge Montgomery reads it just in the First Amendment context, if someone says, I would like to speak, this law is preventing me from speaking. I've spoken in the past, maybe I can speak in other ways, but I want to say this, the law prevents me from saying it. This Court need not proceed any further in determining whether there is irreparable harm. No. And that is common across the constellation of constitutional rights. It's common across the constellation of constitutional rights. I could find, I found a Fourth Amendment case from half a century ago, and that was it. So I think that's an overstatement to say it's common across rights. What, apart from First Amendment cases and that Fourth Amendment case from 1973, applies such a conclusive presumption? Your Honor, I don't know about this Court's case law. Certainly in other cases, in other courts, due process violations, equal protection violations, those would all qualify. Okay, so why should we collapse the four factors into likelihood of success on the merits? What about all that language about PIs being extraordinary remedies, being granted sparingly? What about the history of equity? This is, and what about eBay versus Merck Exchange, which suggests that we're not supposed to adopt presumptions like that in the equitable? I mean, that was a permanent, not a preliminary injunction, but it does suggest we're not supposed to just jump to the merits. In the great bulk of cases, Judge Bubas, that is correct. But in cases involving, I mean, all of those objections you have just raised would apply equally in a First Amendment case. And yet the settled precedent is in First Amendment cases, we presume a constitutional violation, whether it's likelihood of success. We can presume. We don't require the district court to. And a lot of First Amendment cases involve some very time-sensitive, either you're going to speak during this election or the election will be passed. But this dispute, this dispute wouldn't go away. You could have gone ahead to your trial in November 23, and you chose not to. We would have had a trial record by now. I mean, this case, yes, it's not going to go away. But every second of every day that Delaware's law is in force, it is preventing my plaintiffs from exercising their Second Amendment rights. Focusing on your argument, your likelihood of success argument, not delving into the substance of it, but it's a legal argument, right? That's correct, Judge Montgomery. So if we agree with you on the irreparable harm, wouldn't that mean that there is no discretion? I mean, if it's a legal argument, the answer is just yes, we think, yes, they're going to win, or no, they're not. I mean, there's no discretion for the court on a preliminary injunction, is there? I think, Judge Reeves, that is, you know, the court has discretion to determine whether there's a likelihood of success. But if they determine there's a likelihood of success, then it just follows from that determination. Then why do we have an abusive discretion standard of review? Well, because, I mean, many cases involving requests for preliminary injunction, Judge Vivas, don't involve constitutional rights or don't involve constitutional rights that protect intangible interests like this one. So when it's a constitutional right issue, then it's not discretionary. The only question is, you know, answer the legal question and that's it. Don't look at the other problem. I mean, the court does have to determine, of course, that the plaintiffs would like to exercise their constitutional rights. But, yes, I mean, if the plaintiffs can make that showing, which our declarations have averred and have not been disputed, then, no, I don't think there is any discretion to conclude that the violation of Second Amendment rights, just as in the First Amendment context, does not constitute irreparable harm. Let me ask you another question. So as I understand your argument, it's that Heller decided that the government couldn't ban arms that are commonly held for self-defense purposes. But then Bruin went on and devoted 35 pages in the United States Reporter and more than 20 pages in the Supreme Court Reporter to analyzing the history and tradition, whether or not the New York law was consistent with the history and tradition. If Heller held that the government can't ban arms that are commonly held for self-defense, why did Bruin need to spend all that time? A very simple answer, Judge Montgomery-Reese. Bruin did not involve a ban on possession of arms. Bruin involved a restriction on carrying firearms outside the home. It was disputed the extent to which that was protected by the Second Amendment, the limits on the state's ability to curtail that if it was protected on the Second Amendment. So, yes, Bruin went through great lengths to determine whether there was a historical tradition that would allow greater infringement on the right to bear arms than Heller countenanced of the right to keep them. That question just wasn't resolved in Heller. But it simply does not follow that in a case involving an arms ban, a ban on certain types of arms, that the Heller test does not apply. Judge Roth, anything? I have nothing. All right. Let's hear from Ms. Murphy and we'll get you back on the phone. Good afternoon, Your Honors. Erin Murphy on behalf of the DSSA plaintiffs and Amicus NSSF. And with the Court's permission, I'd like to reserve four minutes for rebuttal. Good. Thank you. Millions of law-abiding Americans own semi-automatic rifles, pistols, and shotguns that Delaware has newly banned, and millions more own the magazines that Delaware has forbidden. Under the Supreme Court's decision in Bruin, that forecloses the state's effort to prohibit them because Bruin teaches that our historical tradition is one of protecting the right of the people to keep and bear arms that are in common use for lawful purposes like self-defense. The state's efforts to resist that conclusion rests on arguments that are just fundamentally incompatible with Bruin, including many of the same arguments that Bruin itself considered and many of the same historical laws that Bruin itself considered. To the extent the state begins by suggesting, and the state or its amici suggests that, you know, the firearms or magazines here don't qualify as arms at all, the answer to that question comes from Heller and Bruin, both of which teach that arms constitute anything that is a bearable arm that can be used for self-defense. And there's just not any argument to be made that a firearm ceases to be an arm simply because it has features like semi-automatic functionality and a detachable magazine. Let me ask you a question. Is to be used in self-defense an integral part of any arm? In other words, arms used in self-defense, not simply arms used for any legal purpose? So for purposes of the threshold textual inquiry, I think all that matters is that something is capable of being used for self-defense. It's a bearable arm. It doesn't matter if it's commonly used, if it's predominantly used, if that's its best use. It just has to be something that's capable of being used for self-defense. And when we get to the historical tradition test, which we absolutely agree with what you just heard, that common use. That does not agree with the language of Bruin and Heller, does it? Bruin talks about an arm commonly used in self-defense. Don't we have to consider that description as one integral description of what we're dealing with, not just capable of being used? I don't think that's part of the threshold textual inquiry, because Bruin says that the definition of the word arms simply includes any bearable arms. Now, you are absolutely correct that common use becomes relevant, and we would say dispositive, when you're analyzing the historical tradition aspect of the Second Amendment analysis. Once something is an arm, that just tells you it's presumptively protected by the Second Amendment. You still have to then go on to answer the question of whether it's the type of arm that, though qualifying as an arm, may be restricted or here banned, consistent with the Second Amendment. And what Bruin and Heller teach is that whatever else the states can do in terms of regulation, they cannot ban arms that are in common use today for lawful purposes like self-defense. So we agree that when you get to historical tradition, you have to look— You're sliding off my question, which are used for lawful purposes like self-defense, as opposed to which are used for self-defense. I think the distinction between those two is very important. As I read Heller and Bruin, they say lawful purposes like self-defense, including self-defense. So I don't think it's the only one, but I'm happy to take self-defense as the one we need to prove, because I think it's easily, easily satisfied here, even setting aside the fact that this is actually the state's burden of proof, not ours. Because the types of arms and magazines that we're talking about are commonly held. They're owned by millions of Americans, millions of law-abiding Americans. And the most common reason that law-abiding Americans identify for owning them is for self-defense and or using them at things like shooting ranges where they hone their skills. Are they in fact being used for self-defense? I understand from some of the reading I've done that the percentage of times that these automatic weapons are used for self-defense is minuscule compared to the other, like for instance handguns, the other weapons that are used in self-defense. The fact that an atom bomb is capable of being used in self-defense, but no one would use it. And I think that I feel that it is necessary not just that they are capable of being used in self-defense, but they actually are being used in self-defense. And I'm not sure about these automatic assault weapons, whether they are being used in self-defense. Well, just to be clear, we're only talking about semi-automatic arms here, but I think it all depends on what you mean by the term used. You know, the state wants to cabinet to how many times do I fire a particular arm or fire a particular amount of rounds at a would-be attacker. And that is not a conception of use that's consistent even with the text of the Second Amendment. The Second Amendment protects a right to keep and bear arms for lawful purposes, which the Supreme Court has explained means both possessing them in your home and wearing them to be ready, armed and ready for confrontation. So if somebody uses their firearm within the contemplation of the text of the Second Amendment, any time they keep it at home for the purpose of self-defense or carry it outside the home for the purpose of self-defense. And indeed, if you took the state's conception and asked how often is a particular arm actually fired for self-defense, I'm not sure we'd end up with any firearm protected by the Second Amendment because fortunately most people very rarely have to fire any type of firearm at would-be attackers. They instead keep them and hone their skills with them at places like shooting ranges and fortunately very rarely have to actually fire them. So I don't think that that's the right way to think about the analysis. If you look back at Heller, Heller found that handguns satisfy the common use test because they are, quote, typically possessed for lawful purposes like self-defense. So I do think the right inquiry is to ask about possession, about what people keep and carry for self-defense. And here, again, we don't believe it's our burden. We believe it's the state's burden to prove common use. But even thinking it was our burden, the district court concluded that we satisfied it as to all of the so-called assault long guns that are prohibited by this statute. But you don't disagree that as to the injunctive factors, setting aside the possibility of the second half of merits, that you bear the burdens here? We certainly bear the burdens, but if you look at this court's... But you satisfied those burdens, as I asked your friend on your side. Sure. I mean, we satisfied them under this court's precedent, K.A. v. Pocono Mountain School District, which says enforcement of an unconstitutional law vindicates no public interest and that laws that deprive people of constitutional rights cause virtually per se irreparable harm. That is the law of this circuit as to individual rights under the First Amendment, and I can't really understand any reason why it would be different as to the Second Amendment. I mean, people don't have to come in and show that they have zero First Amendment outlets left. But that approach basically collapses everything into likelihood of excess on the merits. And I think when it comes to a law that violates constitutional rights, violates individual constitutional rights, that's basically correct. I mean, it's not that you don't have to satisfy the other three factors. It's just that absent an extraordinarily rare set of circumstances, they're always going to be satisfied because the Constitution has already done the public interest balancing and said the public interest lies in favor of protecting individual constitutional rights. That is, after all, why they're in the Constitution, to say, we're not going to allow for laws that infringe upon these rights even when it seems like they're in the public interest. And so I think it actually is just kind of at odds with the whole notion of a bill of rights to think that you can have. Except that equity is as old as that, and equity has that history. And, well, there's a Second Amendment interest here, but there's also a Seventh Amendment interest in having, you know, jury trials remain available, at least in cases with retrospective relief. Sure. And I mean, I suppose I would just say, you know, I thought about this and tried to look, and in preparing for this argument, I just, I can't find any law where a court has ever said, yes, this law is unconstitutional, but we think it nonetheless under the balance of the equities should stand. I mean, that just doesn't happen. Once a law is unconstitutional, that necessarily means that it is causing irreparable harm in preventing someone from exercising their constitutional rights, and it is not in the public interest to have laws that violate constitutional rights. Does it matter that we're in a preliminary injunction context? No, I think what matters in the preliminary injunction context is simply that the first piece of the analysis is, of course, a likelihood of harm, so it's a likelihood of success, so it's actually a little bit easier to meet than it is in the ultimate injunctive context. But I do think. Why would that weaken the need to show an irreparable harm? I don't think it does weaken it. I think the three remaining factors apply the same way, whether you're in a preliminary or a permanent injunctive context, and the fact that you could really never say in the permanent injunctive context that you hadn't satisfied the three remaining factors and that a court was going to leave an unconstitutional law on the books or apply an unconstitutional law to somebody because it had determined that it doesn't really harm them or doesn't really serve the public interest to vindicate their constitutional rights. I think that's pretty unthinkable in the context of a permanent injunction, and I don't know why the analysis would be radically different just because it's a preliminary injunction. So it's not that they don't apply. I mean, all factors apply. It's just. Let's say that there's a 20% chance that you're right on the merits. You're saying that no balancing of the equities needs to happen? No, no, no. Because there are harms on the other side if it turns out that you don't win on the merits. If we're only 20% right on the merits, you have a balance to draw between how strong our likelihood of success is and the remaining factors. But that's just a matter of. And I think if you really look at the kind of rare First Amendment cases where courts have said they're leaving some room for the possibility that it's not a per se satisfied, they're really cases where they're doubting whether you actually have a particularly strong likelihood of success on the merits. I mean, the one thing. When you read Winter v. NRDC, you know, granted, it's a statutory case, but the court doesn't say, oh, this is just because it's just a statutory right. It's like, well, factors two, three, and four, so we don't need to reach factor one. I think it makes all the difference in the world that Winter is a statutory case. And I really do think that if you look, you will have a very hard time finding any cases where the Supreme Court or this court has said, yes, we're pretty sure your constitutional rights, your individual fundamental rights are being violated, but, you know, too bad for you because it's in the public interest to violate them. We also have not established that outside the First Amendment context. And the question is what to do. Is it all First Amendment or some? But do we expand the treatment of First Amendment rights, which might be characterized as exceptional, to every other provision? Almost so many things can be recharacterized as due process issues under Section 1983. You're inviting us to basically allow all those 1983 claimants, if they raise a constitutional right, to get an injunction right away. Look, I think that this would be the wrong context in which to stop, because one thing we know is the Supreme Court has said quite emphatically that the Second Amendment is not a second-class right. It's substantive protections, yes. And it said that, and it has specifically invoked First Amendment law in the context of explaining Second Amendment law. It talked about First Amendment law again in Bruin in terms of talking about the historical approach. It talked about it in McDonald in terms of implying, you know, this is a real meaningful fundamental right. So it seems to me it would be pretty problematic. You know, you can worry about the other cases when they come, but, boy, to start here as saying, yeah, we're going to treat this one differently seems pretty odd. In Bruin, it's gone back to history, and it said we're not supposed to apply the tiers of scrutiny, even though tiers of scrutiny persist in some areas of First Amendment law. They do. They're not asking us to go and borrow the First Amendment tiers of scrutiny and apply them. Absolutely not, but the Court specifically looked at First Amendment jurisprudence when explaining that it actually does do historical tradition in the First Amendment context as well, particularly in more recent cases, like there they were invoking United States versus Stevens, which I think is actually instructive in that, you know, I mean, one of the differences, one of the biggest differences between First Amendment and Second Amendment cases is when it comes to First Amendment cases, we have a lot of issues that have already been resolved by the courts. But when the Court confronted in Stevens an argument that a new category of speech was not protected by the First Amendment, they are the depictions of animal cruelty. Once the Court decided that that, like, is at least a form of speech, the burden shifted 100 percent to the government, and it had to justify it by looking at historical tradition. So the Court drew from that and said, you know, this really is the way we've done a lot of things in a lot of other contexts and exactly how we should be doing it here in the Second Amendment context, too. Dr. Droth, anything else? All right. We'll get you back on rebuttal. Mr. Ross, I guess, is going first. Thank you, Your Honor. David Ross, Ross, Aaron, Sam and Moritz on behalf of defendants at police. The district courts exercise of its discretion not to preliminarily enjoin the statute banning guns whose only difference from machine guns, according to the undisputed record below, is the lack of fully automatic fire can be affirmed for three independent reasons. First, the Court can affirm the district court's finding that the plaintiffs failed to establish the irreparable harm necessary to obtain a preliminary injunction. Second, the Court can reject the only argument the plaintiffs made below, which is that assault weapons in large capacity magazines are so common that historical regulations are, quote, immaterial, as they argued at page 11 of their reply brief below and as they also argued to the district court in oral argument. And third, the Court can affirm under various aspects of the full Bruin analysis. Today, I will focus on the irreparable harm factors, the sole argument the plaintiff presented below. In Bruin's historical analysis, my friend from New Jersey will focus on the meaning of in common use and will explain why, as we argued below, that provides an additional basis on which to affirm the decision of the district court. The undisputed record below is that the guns at issue here share core performance characteristics with machine guns. Let's talk about what your friend on the other side pressed with some force, the First Amendment analogy here. So is the fact that they're alleging that they want to exercise Second Amendment rights mean that we shouldn't be doing an independent irreparable harm analysis, that ultimately we need to focus on the merits and then if they win on the merits or have a likelihood of success on the merits, that's enough? Because in First Amendment contexts, we've allowed that? We do not believe that even if they were likely to prevail on merits, which the district court did not find, that that would be enough to establish preliminary harm. We don't believe that it all collapses. Even in the First Amendment context, a violation is not per se remedied by a preliminary injunction. It's true in other contexts as well, including, for example, the equal protection context, construction association of Pennsylvania versus Kreps. And if you look at the cases that they cite in the First Amendment context, what you see is that there were different interests that could not be remedied absent a preliminary injunction. So, for example, in Ayers, what you had was someone who wanted to send invitations to a Christmas party, and obviously if that was delayed, there would be no ability to remedy that. In Lewis, the court noted that it was focused on the potential remedy if the plaintiff prevailed, and there would be no way for an individual to express themselves there wearing long hair without a risk of their constitutional rights being deprivated. Here we have specific factual findings by the district court. As Your Honor noted, several of these plaintiffs already own assault weapons. They all own guns. And critically, it's the district court found, with respect to the irreparable harm factor, with respect to the core purpose of the Second Amendment, one's right to armed self-defense, there are numerous other avenues available for a plaintiff to exercise that right. But that doesn't mean that their Second Amendment rights couldn't be being infringed, right? Just because they have some guns doesn't mean that they don't have a right to have other guns. No, it doesn't mean that there couldn't be some infringement. The court found it to be a very limited infringement at best, and when one is weighing the factors for purposes of a preliminary injunction, the degree of infringement is a relevant consideration. How do we weigh the balance of equities here? And does the public interest collapse into it? Because, you know, you argued below, and you argue that there's a public safety interest here, but these plaintiffs here, they want to have the firearms for lawful purposes, including self-defense. How do we weigh those? The district court, what does our deference to the district court's weighing look like, especially since the district court didn't really express it in those terms? Well, I think how the court would undertake that analysis is to actually look at the factual record that was presented. And in this case, you have a factual record where the sole extent of the evidence that was presented by the plaintiffs is four declarations, which established that seven of them already own assault weapons. They are all on guns. And as the district court specifically found, the types of weapons that they would like to purchase are neither useful for, nor, in fact, based upon the undisputed record evidence before it, actually utilized in self-defense situations. It was on the basis of those. And, of course, there are numerous alternatives available. So it was on the basis of all of that that the court was able to balance. I should add one more thing. I apologize. The court also had below it and considered the devastating potential effects of having these weapons out there. It had the declaration of Lucy Allen with respect to the use of these weapons in mass shootings. Okay. But, you know, in Bruin, the court did say, look, once the Second Amendment has struck a balance, it's not for courts to balance again. Is that different because we're in the preliminary injunctive context? Because when it comes to the scope of the right, we're not supposed to be balancing. No. Bruin has struck a balance with respect to the nature of the underlying inquiry. We don't read Bruin as suggesting that all inquiry, the remainder of the preliminary injunction inquiry collapses and it simply becomes a question of likelihood of success on the merits. Particularly, as we noted, we're at the preliminary injunction stage, not at the permanent injunction stage. Your friend on the other side said, well, that shouldn't make a difference. The irreparable harm analysis is the same in the preliminary injunction and the permanent injunction stage. What's your response to that? Well, once a plaintiff has established that there is, in fact, a constitutional violation, then obviously I think how the court thinks about it has to account for that. But what we are talking about here is a preliminary finding on a limited record, and therefore I think the analysis is different at the preliminary injunction stage than it would be at the final injunction stage. And then just thinking a little bit more about irreparable harm and what that looks like in a case like this. If your friends on the other side had put evidence in of that, like what additional facts would we need to see? Sure. So the plaintiffs could have attempted, they did not, but they could have attempted to rebut the evidence that we presented with respect to both the suitability of the weapons at issue for self-defense and their actual use. The court had undisputed evidence in the Yergolaitis Declaration that these weapons are not well-suited for self-defense. It had undisputed record evidence from Lucy Allen that these weapons are not, in fact, used for self-defense. They could have attempted, we wanted an evidentiary hearing. The plaintiffs did not want that. They could have attempted to cross-examine them, to take issue with it, or to put in their own experts on these points. They chose to do none of that. As I indicated, the weapons that are at issue here share core performance features with machine guns. They have, as Yergolaitis said in his declaration, identical performance capabilities and characteristics. The only difference between these weapons and machine guns is the lack of fully automatic fire. As the Seventh Circuit said in the Bevis opinion, the AR-15 is, quote, almost the same gun as the M-16 machine gun. Because they share common performance capabilities and characteristics, like machine guns, they are designed to maximize lethality. They can shoot through the vests of law enforcement officers. They can penetrate 3-8-inch hardened steel. And when they are used, they cause gruesome injuries. It is, therefore, not surprising, as Lucy Allen said in her declaration, that when these are used in mass shootings, the number of fatalities and injuries increase significantly. Now, the Supreme Court has said in Heller that you can ban machine guns. And it talked about them as M-16s and the like. Justice Scalia said it would be startling to suggest otherwise. And he went on to explain why it would be startling. He did not talk about the number of machine guns in the very same sentence. He said the reason that that would be startling is because machine guns are useful in warfare. And I would note that with respect to the sole performance difference, the lack of fully automatic fire, the undisputed record evidence below from the Yergolaitis Declaration, is that semi-automatic fire is, in fact, the preferred method of fire for the Army in combat situations. And so these weapons, given that limited difference, fall clearly within the and the like that the Supreme Court was referring to when it said M-16s and the like in Heller. Now, with respect to the sole argument that the plaintiffs presented below, they initially acknowledged in their opening papers that Bruin required a historical inquiry. In response to what the district called the defendant's robust historical record, including affidavits from five experts, including a declaration from five experts, including Professor Spitzer, who talked about the historical tradition of regulation, the plaintiffs elected not to present any evidence. They pivoted on reply, abandoned that, and said that because these guns are common, the historical tradition becomes immaterial. Plaintiffs had it right in their opening brief and wrong in their reply. Bruin teaches that the Second Amendment protects only the carrying of weapons that are those- Let me get back to that point. If this case should proceed beyond the argument today, are the plaintiffs still precluded from introducing any additional evidence? They're not, Judge Roth. This was solely for purposes of the preliminary injunction. Judge Andrews specifically found that the findings that he was making were applicable only with respect to the preliminary injunction. So with respect to Bruin, we see in the structure that Bruin contemplates that the in common use analysis is part of the textual inquiry. It notes in Section 3A of the opinion that it was undisputed that the guns were in common use. It then went in Section 3B to undertake the historical analysis. Now, consistent with the plain language of the Supreme Court, when it said that the Second Amendment protected the weapons that are in common use, that only gets you to then the constitutional inquiry. So, for example, in Heckner v. Murphy, this court said a commercial speech case, quote, the First Amendment protects commercial speech. It then went on to consider the restrictions with respect to commercial speech and found that some of those were valid, even though it was protected speech. And I would note critically with respect to the only argument that the plaintiffs presented below, that even Judge Brennan in his dissent in the Bevis case in the Seventh Circuit at page 1211, rejected the idea that commonality alone would foreclose the historical inquiry. He said it is not an on-off switch, that it does not bar the government from regulating, and that even with respect to popular weapons. Does common use include the additional language for common use for self-defense? In other words, in considering common use, are we thinking about common use for any legal purpose, or are we thinking, are we required to think about common use for self-defense? As we argued below to Judge Andrews, we believe that in common use requires that the weapons be actually used for self-defense. And I understand that my friend from New Jersey is going to have that as the focus of his argument. We have focused in our appeal on why even taking Judge Andrews' construct, he disagreed with that. But why even taking that construct, we would still prevail. I would like to take a moment to discuss briefly two critical factual findings with respect to the Second Amendment Inquiry, which is the finding that there is both unprecedented societal concerns and dramatic technological changes. Those are factual findings subject to clear mistake, having presented no evidence on them below. This is a very odd area where there are child tax procedures and things, but at the same time, should we be treating these, as your friends on the other side suggest, as legislative facts, things where they ask us to look at the records of other cases and declarations in other cases? No, Your Honor. We do not believe these are legislative facts. In fact, the very fact that they are citing expert declarations that plaintiffs in other cases chose to submit to those courts, but that for whatever reason, these plaintiffs chose not to submit here, is precisely evidence that these are adjudicative facts. It's exactly what Bruin teaches in Footnote 6, that this is for trial courts to deal with on the record that is presented before them. And the factual findings with respect to unprecedented societal concern and dramatic technical change are critical, because it goes to how the court undertakes its analogical reasoning. We know from Bruin that in no circumstances does the government need to find either a dead ringer or a historical twin, and we also know that in light of those factual findings, you need to take an even more nuanced approach to your examination of analogs and find something that is only relevantly similar. In the Declaration of Professor Spitzer, which talks about the long historical tradition, that starts even before the founding of the nation, comes throughout time into the 20th century. It includes the 1934 Act. It fits well within that. And we see this pattern of regulation throughout history, as Professor Spitzer noted. Even if we were to look, for example, in the founding era, we see that Tennessee, Alabama, and Georgia, in 1837, all passed laws which made it either illegal to sell or imposed massive taxes, the equivalent of thousands of dollars of taxes today on bowing knives. The Tennessee statute was entitled, An Act to Suppress the Sale and Use of Bowing Knives. Alabama passed an act to suppress the use of bowing knives. Georgia did the same thing. So we see numerous analogs throughout history, instances in which, in response to the concerns of violence, the threat to public safety, the risk of disparate use and criminality. We see numerous instances in which governments reacted in a variety of ways. The statutes that were passed here are entirely consistent with that. They're consistent with the founding era statutes. They're consistent with the 1934 Act. And they should be affirmed on that basis. Thank you. Thank you, Your Honor. Mr. Feigenbaum, take your time whenever you're ready. May it please the Court, 15 states, representing almost 40 percent of the U.S. population, restrict assault weapons or LCMs, just as the federal government did for 10 years. As Delaware has explained this afternoon, there are at least three different ways to affirm. And I will address each in turn, starting with Judge Roth's questions about common use, turning to Judge Montgomery Reeve's questions about the history, and closing on Judge Bevis's questions about irreparable harm. Judge Roth, to your questions on common use, we have two primary observations to make. The first is that common use is not and cannot be the exclusive criterion for Second Amendment analysis. And second is that appellant's circulation test is the wrong way to think about common use. On the former, we believe that common use is part of the step one of the Bruin analysis where plaintiffs bear the burden. And the reason is twofold, both from the precedent and from the evidence of original public meaning. On the precedent, Bruin itself uses step one language to talk about the common use inquiry. So at pages 2143 and 2144 of Bruin, it talks about arms in common use for self-defense being the ones that are protected, the ones that get Second Amendment protection. But whether something gets the constitutional protection is the language of the original scope of the right. The text is originally understood. You then engage in an analogical inquiry based on the statutory history to determine whether the particular restriction on that arm falls inside or outside the historical tradition. And so when you're talking about the step one analysis, what gets protection, you're using exactly the kind of language like arms in common use. And we know that it can't be step two because neither Heller nor Bruin actually analyzed any state statutes in engaging in the inquiry to decide whether a particular arm is in common use or not as the appropriate test. Instead, what they did is look at the usual sources of original public meaning to understand the words that appear in the text, and then they proceeded to actually engage with the analysis in Bruin dealing with the public carry right, in Heller dealing with the restriction on handguns, something that we don't see going on in the way that plaintiffs would have this court do the analysis. And I think the Seventh Circuit's decision in Bevis is particularly helpful on this score. The Seventh Circuit's decision specifically walks through the relevant original public meaning evidence, so the 1689 English Bill of Rights, the state constitutions at the time, Blackstone, all of which show that the specific Second Amendment right to bear arms was about arms that facilitate armed self-defense. And as we have undisputed record evidence here, that doesn't include assault weapons, that doesn't include large capacity magazines. Judge Roth, to your other questions on common use, I have two points. What is the right test and what is the right denominator, meaning are you looking at all lawful possible purposes or are you looking at self-defense specifically? In terms of what the proper test is, we don't understand how a circulation or a tallying up of the number of arms in the market could possibly be the appropriate test for four reasons. First, I'm not aware of any constitutional right that turns on looking at how many items exist in the marketplace and give it constitutional protection based on a question like that. Second, a circulation test, as both Bevis and Ocean State Tactical most recently made clear, is inherently circular. We know the test is circular because whether or not someone gets constitutional protection would turn on how many exist in the market, and how many exist in the market would turn on whether and when it was regulated. So the reason machine guns are not as widespread in the market today, Bevis Footnote 7 makes this clear, is because they got restricted first with registration requirements in 1934 and then with a prohibition in 1986. And so we know the reason we don't even see more machine guns in circulation today is because they were restricted. But a law, as Judge Easterbrook put most memorably, I would say, in Freedman, a law can't be the source of its own constitutional validity. But that's the way that their arrangement would ultimately work. Third, the approach that they take is incompatible with the agreement everyone has that you can restrict machine guns. Heller says it would be startling that machine guns would get constitutional protection. This court in Palmetto said that machine guns do not get constitutional protection. And as a result, we know that it can't just be a circulation test because we have 176,000 machine guns in civilian circulation right now, an undisputed record finding the district court made. And again, there's no record evidence in this case at the PI stage that would undermine that. And then finally, we also think a circulation test is inconsistent with Heller and Bruin themselves. Heller does not count how many handguns are in circulation. It talks about the features of a handgun that make it useful for self-defense. Palmetto, the Third Circuit's decision, does not count the number of machine guns in circulation. It talks about the features that are useful in warfare that aren't useful for self-defense. Bruin does not ever count up the number of weapons in public carry in deciding the scope of the public carry right. And Miller itself doesn't count the number of short barrel shotguns in circulation. So we think the test doesn't work. One final point on common use to judge Roth's question about what the denominator is. So the question about whether it can include other lawful purposes like collecting or target shooting or hunting or what have you, I'm not sure is squarely presented in this case for two reasons. First, plaintiffs have not built a record at the preliminary injunction stage that they actually want to use any of these arms for purposes other than self-defense. They haven't shown a record of why they would want to use them for hunting. Instead, the undisputed record evidence in this case from the Yergolaitis Declaration shows that assault weapons and large capacity magazines are not, in fact, useful for hunting. So whatever the denominator is, I'm not sure it really matters under a proper analysis in this case. And I'm not sure it's going to matter in the paradigmatic case either because your prototypical hunting rifle is going to be useful in self-defense in sharp contrast to the large capacity magazine or the assault weapon. But if this Court does reach that Second Amendment question, we do think that the denominator is the self-defense right. Bruin says that in engaging with historical evidence to judge Montgomery Reeve's question, you look at the comparability of the burden on self-defense. And so it doesn't really make sense that common use would turn on something like hunting or collecting, but the historical inquiry would turn on something like self-defense. And the Bevis decision from the Seventh Circuit does a particularly good job of situating the right in its original public meaning and showing the original public meaning specifically yoked the right to the self-defense right. So that's everything I wanted to say on the common use point. Turning quickly to Judge Montgomery Reeve's question about the history, making sure I leave a minute or two for irreparable harm at the end, two points to make here, building on, I think, really helpful opinions, both from the Seventh Circuit and the First Circuit, again, the Bevis case and the Ocean State tactical case. We have a historical tradition in this country of regulating arms once they enter the civilian market and once they become widespread enough that they need to get restricted. So the undisputed record evidence that we have in this case, dealing with the Bowie knives, specifically addresses to your question, Judge Montgomery Reeve's, exactly how our historical tradition works. It's not a circulation test. It's not the idea that once something enters the market, you lose the ability to restrict it. Instead, it's that once something enters the market, you have reason to want to restrict it, and legislatures do restrict it. So 42 states had various restrictions on Bowie knives, including multiple restrictions that outright prohibited both manufacture and sale. Forty-three states restricted slung shots, again, including a number of them that restricted manufacture or sale. So whether it's carry or manufacture or sale or even possession outright, they all reflect a national and longstanding historical tradition of flexibility, of different states having different responses to shared public safety problems, because that is a part of the historical tradition we've always seen. Not every state regulates in the same way. Alaska, New Jersey, and Delaware, and other states may have very different approaches to some of these public safety questions, but our historical tradition has always embraced that, going back to the 19th century, the 18th century, and before. Now, Judge Peebus, with the two minutes remaining, I do want to talk about the irreparable harm questions that you asked today and make two points. First, what we heard today at the podium is that plaintiffs have embraced fully the idea that constitutional harm must always be, per se, irreparable harm, because they've built no record that they're suffering any irreparable harm that goes beyond that. This isn't a surprise in the appellant's opening briefs. They also stake their case entirely on the idea constitutional harm is, per se, irreparable harm. I don't think that can be quite right, partially because this Court has said that's not quite right in cases like Ho v. Casey and Anderson v. Davila. I think it also can't be right, in large part, because of Winter. I understand that my friends on the other side are trying to draw a distinction between statutory and constitutional. I'm not quite sure I understood the way they were doing it. The whole reason that agencies can't act beyond the authority granted to them by statutes is our constitutional understanding that the executive has to stay in the lanes the legislature has provided. So if the Army, in the case of Winter, is violating NEPA, is going beyond what environmental requirements would have them do, they are violating the separation of powers, as I think my friends on the other side would agree, because executive agents can't flout congressional statutes. And when you have that situation, you have Winter. But Winter was very clear that the military exercises were allowed to proceed without simply saying merely because you have a likelihood of success on the merits, we'll draw a line then and collapse the entire inquiry. I think it's especially important when we're thinking about disrupting the status quo. Both this Court and the Supreme Court have long made clear that disruptions on the status quo require a little more attention, a little more support at the preliminary injunction stage, especially when you have, say, delays from the other party, which I'm not saying about this case specifically, but it's something we see all the time in constitutional litigation. And I do think a contrary rule would have significant problems, not just for the parties, but for judicial economy, because it's going to require courts to collapse PI inquiries into a single likelihood of success factor every time. And when it does the likelihood of success on a limited record, this case is a perfect example. There is no record from the plaintiffs dealing with some of these historical questions, these technical questions, et cetera. I do think that's a real risk for courts, not just for parties. And if I might go about 20 seconds over to answer your question about Lewis, Judge Bibas. So I think you were asking about Lewis versus Kugler, and I just want to note in footnote 12 in that opinion, the Court was specifically talking as well about how whereas in this case it is alleged that First Amendment rights have been chilled as a result of government action, a presumption of irreparable harm is manifest. So it's not even clear that Lewis was fully disaggregating Fourth Amendment from First Amendment as opposed to perceiving some risk of chill in that case from the behavior of the police that was being challenged. So it's not even obvious that Lewis alone, and I spite you that it's also 50 years ago in a one-off case, stands for the proposition that all constitutional cases are going to collapse into a single likelihood of success analysis. So given Winter, given what we see in elections cases like Purcell,  and given that Lewis I don't think stands for that proposition, if all plaintiffs are resting on is the idea that constitutional harm is always irreparable harm per se, I just don't think they've made their case. Thank you. Thank you. Mr. Polendorf, rebuttal. Thank you, Your Honors. Just a few quick points. First, on the irreparable harm and the injunction factors, I think even my friend on the other side couldn't swallow the pill that a permanent injunction upon finding an actual constitutional violation, a court could decline to enter a permanent injunction of the violation because it concluded that, you know, the other equitable factors didn't favor that type of relief. Terms of declaratory judgment suffices, and courts don't grant an injunction in that situation. Judge Bibas, I just can't conceive of a rule that a First Amendment or Second Amendment violation, a court would not enjoin an actual violation of one of those constitutional rights because it concluded it's just not important enough. There's not enough tangible harm here. All right. Well, what about your friend's skillfully alluding to your four-month delay in seeking this relief? Judge Bibas, I mean, number one, all of the delay cases they cited did not involve constitutional rights. They involved, you know, patent disputes or monetary disputes of that kind, and they also involved much, much longer delays. I mean, one of the cases was a three-year delay, and another one I think was 13 months. So I think that just doesn't factor into the analysis at all. On common use, Your Honor, if I may, plainly that is part of the tradition prong under Bruin, not the text prong. I mean, I would love to hear, I have yet to hear, and I didn't hear from my friends on the other side this morning what word in Second Amendment common use comes from as a matter of the plain text or what Bruin called an analysis of the bare text. I mean, I have yet to hear an answer to that, but we do know from Heller where it does come from. It comes from two historical traditions, the tradition that the militia would come into militia service bearing the arms typically in common use, and the tradition that, conversely, governments could ban the carrying of dangerous and unusual arms. Those clearly are historical analyses under Bruin's second test, not under its textual test, and Bruin itself says this. Finally, on history and tradition, if I may, Judge Villabuz, very quickly, just two points. First, if this Court does decide to look beyond common use, the historical analysis has to be limited to the founding era. That's what a panel of this Court held in the Lara case. That's binding here unless the Court decides to take it en banc. I haven't heard the great bulk of the founding era laws they've cited below are laws that apply to slaves specifically. I don't think those can conceivably carry its burden. This morning my friend mentioned three laws from the 1830s. I think 1837 is too late. I also would note one of those was struck down by the Georgia Supreme Court in nine as contrary to the Second Amendment. So I think plainly that does not suffice to bear the state's burden either. I thank you, and you're entitled to some rest because we're no longer in the morning. We're in the afternoon now. Ms. Murphy. Thank you. If I can just supplement a couple of points Mr. Illendorf made and then add a couple more. The one other thing I would add on the injunctive relief factors is it's not just that I think it's right as a matter of comparison to other constitutional rights. What you heard basically this morning is this isn't causing any harm. It's not a big deal because we're pretty confident you can defend yourself with something else. And if there's one thing that Heller already addressed fairly, it was that question. Heller said, and I quote, it is no answer to say that it's permissible to ban the possession of handguns so long as the possession of other firearms like long guns is allowed. And then it went on to say it doesn't matter. We hypothesize some reasons why people might prefer something, one type of firearm to another. But at the end of that paragraph, the court says whatever the reason, handguns are the most popular weapon chosen for self-defense in the home. So a complete prohibition is invalid. So I don't think it's open to the state to come in now and say, you know, it's all well and good that you would like to have a semi-automatic rifle. But we think you can do well enough with a revolver or whatever it is that they think is permissible. On the common use test, I would just point you, you know, Mr. Feigenbaum pointed specifically to page 2143 of Bruin. I'd invite you to go read that paragraph because before the court uses the words in common use, it specifically says, drawing from this historical tradition, we explain in Heller that the Second Amendment protects the carrying of weapons that are in common use. And if you look earlier at page 2128 of Bruin, the court again says, we found it fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons, that the Second Amendment protects the possession of weapons that are in common use at the time. So it's quite clear that the court is drawing the common use test not from the word arms, which of course says nothing about common use, but from the historical tradition of prohibiting dangerous and unusual weapons. Now that gets to the argument you heard about how, well, yeah, the court may have said that lots of times, but they couldn't possibly have meant it because it's a bad test and it's circular and it doesn't work. That just rests on a misunderstanding of the test because what the state continues to overlook is it has to be dangerous and unusual in order for an arm to be banned, which means if a state comes in and just bans something because it's new on the market, but what it's banning is not materially different at all from things that are already on the market, it's not abnormally dangerous in some way that differentiates from other arms, that's satisfied the abnormally, unusually dangerous component. So this whole idea of circularity is just built on a false premise. And I think you see that if you look back to machine guns. Everybody always wants to say, oh, machine guns were, you know, that just proves that this is all circular because the only reason they're not common is because they were banned. In fact, they were banned because they weren't common. They came onto the market in around 1921 and there were, you know, thousands of them available, tens of thousands of them available. If you look to the declaration, the state's own expert, Professor Spitzer, explains nobody really wanted them. There wasn't a big rush to go buy these. Instead, there was a big rush to ban them. By 1925, states started banning them. Thirty-two states had banned them by 1934 when the federal legislation came along. So what we saw is the reaction of Americans all across the country was, we actually do think this is something new and different that requires different treatment, and that's particularly notable given that by the time these submachine guns, these bearable automatic firearms come onto the market in the 1920s, semi-automatic rifles like the ones we're talking about here today had been on the market for more than 30 years, and nobody was prohibiting them. And even in the 1920s when the states, a vast majority of the states started banning these automatic weapons, they recognized the difference between the two, and only a handful of states imposed any restrictions on semi-automatics. And if you study those restrictions and what even Professor Spitzer had to say about them, you will find that no more than an absolute most five had any kind of ban on semi-automatic technology, and all but the District of Columbia's was repealed or amended within a few decades. But it is only recently in the last 20 years that semi-automatic weapons have been used by people in mass shootings who want to infect as much damage and death as possible very quickly, so that the use that has upset people today was not a use that was recognized or was not a use that was in actual use 50 years ago. So don't we have to consider the present use or the change of use of these weapons, not just the fact that they originally appeared on the market shortly after World War I? If that were the typical means for which they were being used, I'd be with you. But when less than one-tenth of one percent, and probably even less than that, of these firearms are being used by somebody for that purpose, and the vast, vast, vast majority of people in this country who own those weapons own them for lawful purposes like self-defense, then Heller and Bruin teach that you cannot ban them from the possession of law-abiding citizens, because the Second Amendment – You are saying forget the fact that it's only very few cases where they're used for these terrible purposes. Move on to something else. There are people who are concerned that the fact that they are used for these terrible purposes, minuscule as it may be, is something that is needed to protect all of us from those circumstances arising in our own life. I very, very much appreciate the concern, which is a concern that all of us share, Judge Rock. But the problem is that Heller considered very similar, indeed, some of the same concerns. There were amici there who made the same arguments, that handguns should be prohibited because handguns are the overwhelmingly common use of firearms in mass shootings. And what the Supreme Court said is, we will take all of that as a given. We are not going to dispute that the problems you are talking about are real, but the Second Amendment already struck the balance in favor of protecting the rights of the law-abiding citizens to protect themselves against the people who would use arms to cause them and their loved ones harm. Thank you, counsel. The case is submitted. We'd like to ask both sides to work together to produce a transcript and split the cost. And let's go off the record for a moment so we can greet counsel at sidebar before our next case. Thank you.